**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
REMEDE CONSULTING GROUP INC.,                              19-CV-3950 (NGG)(VMS)
And JEROME DANIEL
                              Plaintiff,

             -against-

SHEDRICK HAMER,
                              Defendant,
-----------------------------------------------------------X

## PLAITINFFS' MEMORANDUM OF LAW IN REPLY TO DEFENDANTS OPPOSTION TO PLAINTIFFS' PRELIMNARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS MOTION TO DISSMISS

LAW OFFICE OF MEIR MOZA & ASSOCIATES
*Attorney for Plaintiff*
JEROME DANIEL; AND REMEDE CONSULTING GROUP INC.,
217 Willis Avenue – suite 101
Mineola, New York 11501
(516) 741-0003

## **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT.................................................................................... 4

FACTS....................................................................................................................4

LEGAL ARGUEMENT........................................................................................... 12

POINT I.       Plaintiffs Damages are Imminent, Irreparable and the Equities favor Plaintiffs RCG and Daniel................................................................................................... 12

A.       Plaintiffs have been and continue to be at risk of Imminent Injury and never abandoned the TRO......................................................................................... 17

B.       Plaintiffs' have and will continue to suffer severe, immediate, irreparable injury, loss and great pecuniary damage, as well as severe damage to its business reputation, unless the defendant is enjoined and restrained.............................................................17

C.       Plaintiffs' Can and already have established a Likelihood of Success on the Merits when Justice Diccia T. Pineda-Kirwan reviewed the Emergency application and signed the TRO in Nassau County Supreme Court where this case was originally filed.....................19

D.       Plaintiffs' Can and Have Established a Sufficiently Serious Question Going to the Merits and a Balance of Equities Favors Plaintiffs' because the nature and success of the business that the Plaintiffs conduct relies entirely upon the Proprietary Trade Secrets and Database information that the Defendant wrongfully took and as demonstrated, even a few Clients, Temps, Employees, etc., taken by Defendant could effectively cripple Plaintiffs business.................................................................................................................19

POINT II.       Plaintiffs' Complaint sufficiently alleges causes of action as a matter of law..........................................................................................................................20

A.       Plaintiffs' second cause of action is clearly stated and expressly alleges a breach of the fiduciary duty of Loyalty and Good faith that are universally owed by agents to their principals as well as a breach of the duty of good faith and fair dealing that is owed in every contract and is different from and separate to the breach of contract claim.....................23

B.       Plaintiffs' clearly state in their third cause of action that to the exclusion of Plaintiffs' rights, the Defendant intentionally accessed, exported, and downloaded the entire database onto a personal device immediately before his resignation.................................................26

C.       Defendant's employment contract does not in anyway govern and permit the taking and retention of confidential proprietary information belonging to Remede Consulting

Group and clearly requires any employee to return any and all data, information, property, materials, ect., back to RCG upon termination of employment.............................................28

D.  Plaintiffs' fifth Cause of Action should not be dismissed because the Databases that the Defendant wrongfully took are not publically available and as stated in the complaint are the result of not only private fee based subscriptions available only to members within the industry, but mostly built and compiled after years of developing relationships, reputation, and hard work within the industry...................................................................28

E.  Plaintiffs' sixth Cause of Action should not be dismissed similarly to their fifth Cause of Action because the databases are proprietary trade secrets that belong to the Plaintiffs..............................................................................................................................31

F.  Plaintiffs' first Cause of Action for Breach of Contract should not be dismissed because there was a valid contract between the parties, the Plaintiff performed on that conract, the Defendant then breached that contract in several ways, and the Plaintiffs' have and will continue to suffer damages resulting from the breach............................................34

POINT. III.  Daniel Is a Necessary party and has suffered injuries in equity to RCG........35

POINT IV.  The Defendant is not entitled to Attorneys fees from the prevailing party clause in the employment contract because he has not prevailed in this case.....................36

CONCLUSION ...........................................................................................................36

Plaintiffs REMEDE CONSULTING GROUP ("RCG or REMEDE") and JEROME DANIEL ("DANIEL") (jointly "Plaintiffs") submit this Memorandum of Law in reply to Defendant Shedrick Hamer ("Hamer" or Defendant") opposition to the Motion for a Preliminary Injunction of plaintiffs pursuant to Federal Rule of Civil Procedure ("FRCP") 65 and in opposition of Defendant's Cross-Motion to Dismiss made pursuant to FRCP 12(b)(6).

## PRELIMINARY STATEMENT

The instant matter now before the Court originated in State Supreme Court in Nassau County and was removed by the defendant based on Diversity Jurisdiction. The Plaintiff is a resident of New York and the Defendant is a resident of the state of Georgia.

The complaint alleges six causes of action for: (i) Breach of Contract; (ii) Breach of Fiduciary Duties of Loyalty and Good Faith; (iii) Conversion; (iv) Unjust Enrichment; (v) Misappropriation of Trade Secrets; and (vi) Unfair Competition. Additionally and most pertinently to the case, the Plaintiff filed an Order to Show Cause seeking a Temporary Restraining Order and Injunction to restrain and enjoin the Defendant from, among other things, destroying, secreting, disseminating, soliciting, and transferring data that was taken by the defendant just prior to his resignation containing sensitive biographical and contact information of potential leads, temps, and clients belonging to the Plaintiff.

## STATEMENT OF FACTS

Remede Consulting Group (formerly Remede Staffing Solutions) operates as a professional and technical staffing agency. Providing staff support to its clients (Nursing Homes, Hospitals) in the areas of Nursing and other Medical fields.

This action was initially commenced by Jerome Daniel and Remede Consulting Group Inc., in New York State Supreme Court, Nassau Count. On July 9, 2019, defendant Shedrick Hamer removed this action to this Court on the pretext that this Court had subject matter jurisdiction based on diversity.

On or about January 4, 2016 Defendant was hired as a Travel Recruiter and on or about January 4, 2017, Defendant was promoted to Manager, Recruitment & Accounts by the company and signed a valid employment contract dated December 30, 2015. **(See exhibit "B").**

The valid employment contract signed by Hamer, clearly states in paragraph 9 and 10 that an employee will have access to valuable trade secrets and documents but under no circumstance may that information be taken, disseminated, or shared with outsiders unless expressly permitted in writing. **(See exhibit "B").**

In addition, the employment contract signed by Hamer, clearly states in paragraph 11, that solicitation of other employees of RCG is not permitted for a period of two years following the termination of the employment agreement. **(See exhibit "B").** Thus, Hamer could not attempt to persuade other RCG employees to leave RCG and come work either for or with him in another similar venture.

As Manager of Recruitment & Accounts, the defendant had total access to company trade secrets and access to full recruitment lead, employee and client lists. Hamer's responsibility was to access the recruitment databases and unlock the leads for the company to then use for recruitment purposes.

Recruitment Lead lists are organized and available through recruitment databases that companies like RCG have access to through subscription programs. The information that the databases provide are mostly biographical including:

a) First and Last Name

b) City, State, Zip code

c) Email contact

d) Phone number

e) Preferred contact time (optional)

f) Travel Status

g) License Type

h) States the individual is licensed to work in.

i) Years experience

j) Preferred Destination (optional)

k) Date Submitted

l) Date the information was unlocked

m) Who Unlocked the information

n) Eligibility to work in the United States

Two of the subscription programs that RCG and certain employees of RCG, have access to and use regularly, are Travel Nurse Source (TNS) (**See exhibit "C"**) and Allied Travel Careers (ATC). (**See exhibit "D"**).

Every month, RCG is able to search the databases and unlock up to 500 "leads" in TNS and up to 250 "leads" in ATC. By unlocking the lead, it means that RCG now was access to that healthcare professionals contact information.

After unlocking a lead, the system will prompt the individual that unlocked the lead, with the option to transfer the leads into the Applicant Tracking System, Contingent Talent Management (CTM). Once they are moved into the applicant tracking system, all RCG recruiters can have access to the leads contact information in CTM.

It should be noted here that the leads within the subscription programs ATC and TNS are different from the entire Database which is housed in CTM and is what the Defendant ultimately downloaded and wrongfully took upon resignation.

As stated above, the leads that were accessed in the subscription services have limited availability and access monthly. The Defendant effectively maxed out RCG's access to the subscription programs for the month of February and then on or about February 6, 2019, abruptly resigned without notice or cause from RCG.

Upon information and belief, Hamer engaged in the taking of such valuable Recruitment Lead information from the two recruitment databases (TNS & ATC) just prior to his resignation to compete against the Plaintiff.

On the dates: January 23, 2019, January 31, 2019, and February 1, 2019, Hamer unlocked 589 leads from TNS database. These leads were not transferred into RCG's Applicant Tracking System; therefore all of the other RCG recruiters did not have access to those leads in CTM.

On the dates: January 31, 2019, and February 1, 2019, Hamer unlocked 500 leads from ATC database. These leads were not transferred into RCG's Applicant Tracking System; therefore all of the other RCG recruiters did not have access to those leads in CTM.

Per the subscription guidelines, ATC allows RCG up to 250 unlocks per month, therefore by unlocking all 250 leads on January 31, 2019 and another 250 on February 1,

2019, Hamer effectively locked out RCG's recruitment team from being able to access leads for an entire month. Then on or about February 6, 2019, Hamer abruptly resigned without notice or cause from RCG. **(See email from VP of RCG attached herein as exhibit "E").**

The plaintiff sought out the services of Track5 Media, a company that provides both TNS and ATC databases in order to confirm which user had unlocked the leads and on which date.

These recruitment leads constitute valuable trade secrets and confidential proprietary information to RCG, for which the company pays a substantial monthly subscription fee to access. The recruitment leads are not available openly and freely to the market; rather, they must be accumulated over time from a variation of hard work and building a reputation and relationships within the industry as well as from access to subscription services that are exclusive to members of the industry, and even then, companies are limited in the amount of leads they may access at a time.

Therefore, these leads represent an enormous loss of revenue for RCG if they are contacted and put to work by Shedrick Hamer or his current employer. **(See exhibit "E").**

- Potential lost revenue for Remede if only 10 leads are put to work by the defendant:
  - Average Bill rate - $70.00
  - Average contract length – 13 weeks (468 hours)
  - Average revenue per contract - $32,760.00
  - Total for 10 lost contracts - $327,600.00

Jerome Daniel contacted CTM database administrators in an attempt to discover any and all unauthorized downloads from CTM, made by Hamer just before his resignation on February 6, 2019. CTM houses RCG's entire client, employee and prospect database since

the company's inception.   To put a value to this database, it generated $11.1 million in revenue in 2018.

The database administrators sent a copy of the user log that tracks and details a users activities involving RCG's business. The copy of the user log includes the IP address and Username of the individual currently accessing the database as well as the action that the individual took at that moment **(See exhibits "F and G").**

The data report shows that Hamer exported and took a total of 36,953 leads on January 28, 2019 as well as exported and took a total of 3,183 clients' files on the same date **(See exhibits "F and G")**; then he abruptly resigned from RCG.

The potential loss chart was included to emphasize to the Court the potential danger if our temporary restraining order and request for a permanent injunction was not granted. The chart shows what the average contract revenue RCG could lose if the defendant contacts and *puts to work* temps from the CTM database that was taken by the Defendant.

However, at the time this action was commenced, plaintiffs were in possession of evidence that Shedrick Hamer has solicited and put to work one former temp by the name of Shirley Gooden.

While every contract is different, based on the potential loss chart that shows the average contract, RCG has been damaged in the amount of $32,760.00 for the lost contract of former temp Shirley Gooden.

Additionally, in the complaint plaintiff state's that he has evidence that the Defendant has also solicited and put to work a former employee by the name of Erin "Eli" Lewis. See a copy of the verified complaint attached hereto as **Exhibit "A"**

There is a distinction between employees and temps when it comes to recoverable damages and potential loss to the company. A temp or a lead's contract is what is included in the chart that the defendant is relying upon to remove this action to federal court, however, a lost employee is not a part of that chart or its calculations. Rather, the operating agreement has a provision that allows for the recovery of up to five thousand dollars ($5,000.00) per employee solicited and put to work by the person who violates that provision in the employment contract. See attached (**Exhibit "B"** ).

Upon information and belief, Shedrick Hamer took these employee, recruitment leads and clients information with him upon his resignation to use for his own capital gain elsewhere.

RCG also has evidence that Hamer was working as a manager for a similar company that competes directly with Remede Consulting Group, called "Procare USA" simultaneously while he was working for RCG **(See exhibit "H")**.

Upon information and belief the defendant was already working for Procare USA for two months prior to February 26, 2019. **(See exhibit "I")**. . Additionally, upon information and belief the defendant still works as an employee for Procare USA. **(See exhibit "H")**

Defendant lived with Erin "Eli" Lewis during his employment with Remede. Eli was also employed by Remede as a Credentialing Specialist. They both worked remotely for Remede from their home outside of Atlanta, GA.

Both Defendant & Eli used their personal laptops & cell phones in their job duties with Remede. Remote employees are to logon to the Remede server. However, most of the systems that are used; VMS portals, Travel Nurse Source, Allied Travel Careers, Contingent

10

Talent Management are Internet based and can be accessed directly without logging into the server.

Remote employees often work outside of the server, for greater speed. Both Defendant & Eli worked outside of the server at times throughout their employment. Because of this, they would have saved Remede employee information; resumes; references, and credentials on their personal computers. Cell phones were also used to text candidates and employees, so again Remede employee information would have been saved to both their personal cell phones.

Upon information and belief, up to but not limited to, a total of one employee(s) so far, have been solicited by Defendant to leave RCG and work with or for him. Pursuant to the employment contract signed by Defendant, remedy for violation of paragraphs 9-12, includes:

     I.   A preliminary injunction; and

    II.  Liquidated damages in the amount of Five Thousand dollars for each breach of paragraph 11 of this Agreement.

Eli also often contacted the Travelers via text, requesting credentials and also to follow-up with them if they did not submit their timesheets in a timely manner. Therefore, Eli would have had Remede employee contact information saved to his cell phone.

Therefore, both Defendant's 's & Eli's personal laptops and cell phones hold contact information for both Remede Traveler employees as well as contact information for recruitment leads that were paid for by Remede. In addition, both could have hard copy files including this information in their home office files.

11

Both the Defendant's & Eli's Facebook profiles indicated that they work at TravelNurse911.com. **(See exhibit "J").** This is apparently a recruitment database that Defendant created and used to recruit healthcare travel professionals.

Upon information and belief there is a possibility that any employee or recruitment lead data obtained during their employment with Remede, has been entered into the TravelNurse911.com database.

Upon information and belief, and in further violation of the non-solicitation clause of the signed employment contract; in violation of fiduciary duties; and in violation of common law fair competition laws; Shedrick Hamer has used his knowledge of trade secrets and confidential corporate information to solicit the business of existing medical staffing clients and/or to recruit RCG's active employees, inactive employees or to use for himself and/or his new employer.

## LEGAL ARGUMENT

### POINT I

### PLAINTIFF IS IN DANGER OF IMMINENT AND IRREPARABLE HARM AND THE EQUITIES FAVOR THE PLAINTIFF.

It is well established that "In order to obtain a preliminary injunction, a plaintiff must demonstrate both: (1) the likelihood that it will suffer irreparable harm if the motion is not granted and (2) either (a) a likelihood that it will succeed on the merits of the action or (b) a sufficiently serious question going to the merits of the action and that the balance of hardship's tips decidedly in plaintiff's favor." *Register.com, Inc. v. Domain Registry of Am.,* 2002 U.S. Dist. LEXIS 24795, at *25 (S.D.N.Y. Dec. 26, 2002). A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a*

*clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997). *See also Med. Soc. of N.Y. v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977) (reversing the district court and vacating a preliminary injunction).

**There are two grounds under the CPLR 6301 for granting a preliminary injunction:**

**The subject of the action is in jeopardy**, i.e., where it appears that the defendant threatens, or is about to you, or is doing or procuring an act in violation of the plaintiffs right with respect to the subject of the action, and which may render the judgment ineffectual (e.g., the transfer, removal or destruction of property which is the subject matter of the lawsuit). <u>Citineighbors Coalition of Historic Carnegie Hill v. N.Y.C. Landmark Preserv. Comm.</u>, 2 N.Y.3d 727 (2004).

**The plaintiff ultimately seeks a permanent injunction**, i.e., where it appears in any action that the plaintiff has demanded and would be entitled to a judgment restraining the defendants from the commission or continuance of an act which, if committed  or continued during the pendency of the action, would produce injury to the plaintiff. <u>The first ground covers a situation where the defendant might do something to the subject matter of the plaintiffs cause of action that would render the ultimate judgment meaningless.</u>

<u>The second ground gives security to a plaintiff who is suing to compel or prevent certain action. Here, a preliminary injunction maintains the status quo by preventing the defendant from acting pending the lawsuit in a way that could irreparably injure the plaintiff so that a victory in court by the plaintiff would be meaningless.</u>

The plaintiff seeking a preliminary injunction must first show that he or she has a cause of action against the defendant. Once the plaintiff demonstrates a cause of action, he or she

must demonstrate the grounds for seeking a preliminary injunction (e.g., the subject of the action is in jeopardy or the plaintiff is seeking a permanent injunction).

### The following standards are used by the court, which include:

A Court will want to be assured that, if the Court grants a preliminary injunction (necessarily impinging upon the defendant's rights), the plaintiff is likely to prevail on the final determination on the merits of the action. It is not sufficient to show that the plaintiff may ultimately prevail on the merits, Continental Telephone Company v Continental Telephone Company Supply Co., 29 A.D.2d 513 (1st Dep't 1964) and yet the plaintiff is not required to show a certainty of success. Tucker v Toia, 54 A.D.2d 322 (4th Dep't 1976). It is sufficient, however for the moving party to make a prima facie showing of its right to relief. Zurich Depository Corp. v Gilenson, 121 A.D.2d 443 (2d Dep't 1986); Tucker v Toia, 54 A.D.2d 322 (4th Dep't 1976).The mere creation of factual issues by the party opposing the preliminary injunction is not sufficient on its own to defeat the preliminary injunction application. CPLR 6312 (c); see Independent Health Ass'n Inc. v. Murray, 233 A.D.2d 883 (4th Dep't 1996).

### Irreparable injury unless the injunction is granted:

The plaintiffs anticipated injury must be irreparable to qualify for a preliminary injunction. "Irreparable" has been defined to mean that, without a preliminary injunction, the plaintiff would not be adequately compensated by monetary damages or there is no set pecuniary standard for measurement of damages." Bd. of Higher Educ. V. Marcus, 63 Misc.2d 268, 272 (Sup. Ct. Kings Co 1970); Haulage Enterprises Corp., v. Hempstead Resources Recovery Corp., 74 A.D.2d 863 (2d Dep't 1980). Mere apprehension of irreparable damage is not enough.

14

It must be shown to the court that the defendant's acts are occurring or are threatened and likely to occur. Siegel, New York Practice Section, 328 at 524 (4th ed. 2005). One Court has distinguished "irreparable injury" from ordinary injury by defining irreparable injury as that which cannot be repaired, restored or adequately compensated in money, or where the compensation cannot be safely measured. Bisca v. Bisca, 108 Misc.2d 227, 231 (Sup. Ct. Nassau Co. 1981). Damage to a corporation's reputation is irreparable injury because the injury is incalculable, thus, money damages are insufficient compensation. Klein v. Klein, 186 A.D.2d 631 (2nd Dep't 1992).

## No adequate remedy at law:

A preliminary injunction will not be granted if the plaintiff has an adequate remedy at all. A remedy of law is adequate if it is as practicable and efficient as an equitable remedy. Lesron Junior, Inc. v. Feinburg, 13 A.D.2d 90 (1st Dep't 1961). It is inadequate "when the damages are not capable of measurement or difficult to determine where there would be a big delay." Board of Higher Educ. V. Marcus, 63 Misc. 2d 268, 272 (Sup. Ct. Kings Co. 1970); 475 Ninth Ave. Assoc. LLC., v. Bloomberg, 2 Misc. 3d 597 (Sup. Ct. New York Co. 2003).

## Balancing of the Equities under the "Comparative Hardship Test":

Under this balancing test, the court will grant the injunction where the moving party presents proof that the comparative harm he will suffer if the injunction is not granted is significantly greater than the harm that the non moving party will suffer if the injunction is granted. Borenstein v. Rochel Properties, Inc., 176 A.D.2d 171 (1st Dep't 1991).

## Discretion:

In balancing the relevant factors, the court has wide discretion in deciding whether to issue an injunction. In reviewing the grant of the preliminary injunction, the purpose of

which is to keep the status quo pending a final determination, an appeals court will only look at whether the lower court abused its discretion. Gambar Enterprises, Inc., v. Kelly Services, Inc., 69 A.D. 2d 297 (4th Dep't 1979).

## Procedure for a preliminary injunction:

The motion must be made on notice and maybe served with the summons or at any time before judgment; CPLR 6311(1). Plaintiff must submit an undertaking in an amount determined by the court.

## Temporary Restraining Order:

A temporary restraining order ("TRO") may be granted where it appears that the immediate and irreparable injury, loss or damage will result unless the defendant is restrained before a hearing for a preliminary injunction, CPLR §6301. Although CPLR 6313 (a) permits a TRO to be obtained from the court without any notice to the other party, 22 NYCRR § 202.7 (f) (paralleling Fed. Rule of Civil Pro 65 (6) now requires the moving party to show that in good faith effort was made to give the opposing party notice (date, time and place) of the TRO motion or to articulate how significant prejudice would result by giving such notice. A TRO is generally granted ex parte by the way of an order to show cause designed to schedule a hearing for the preliminary injunction, CPLR 6313 (a). If the court grants the TRO, it will set a date for a hearing for the preliminary injunction "at the earliest possible time;" and may prescribe the method of and deadline for service of the TRO. If no method is given, the TRO and all supporting papers must be served personally in the same manner as a summons. CPLR 308. If there is no action pending, the plaintiff must obtain an index number and include a summons with notice (or a complaint) with the order to show cause.

16

The court may, in its discretion, require the plaintiffs to post an undertaking. A TRO continues until the hearing for the request for a preliminary injunction, which is to be conducted at the earliest possible time after that TRO is granted. CPLR 6313;  Carrabus v. Schnieder, 111 F. Supp.2d 204 (S.D.N.Y 2000).

First and formost, the Plaintiff's did not abandon their TRO or Injunction claim and the Defendant is being disingenuous using that argument knowing full well that Plaintiffs were attempting to have the case remanded back to state court. This is not indicative of abandonment or a lack of threat of imminent harm no more than it could be indicative that the Defendant is trying to draw out the court process by removing the case to federal court. Time was extended for the Defendant to put in opposition and an answer however, motion scheduling and the time needed for the decision on the remand motion delayed the case.

Here, the plaintiffs will likely ultimately prevail on the merits, because the plaintiffs moving parties have submitted extensive evidence that provides a prima facie showing of its right to relief.  The mere creation of factual issues by the party opposing the preliminary injunction is not sufficient on its own to defeat the preliminary injunction application, CPLR 6312 (c).

Here plaintiff's injuries are immediate and irreparable and qualify for a preliminary injunction. Here, without a preliminary injunction, the plaintiffs will not be adequately compensated by monetary damages. Plaintiffs have shown to the court that the defendant's acts are ongoing, continuous and occurring presently and will continue to occur in the future.

Here plaintiff's injuries are irreparable injuries which cannot be repaired, restored or adequately compensated in money, and which compensation cannot be safely measured, as

in this case because, the damage to a corporation's reputation is irreparable injury because the injury is incalculable, thus, money damages are insufficient compensation. Here plaintiffs have no adequate remedy at all whatsoever. A remedy at law is adequate if it is as practicable and efficient as an equitable remedy. It is inadequate "when the damages are not capable of measurement or difficult to determine. Here, the plaintiffs will prevail on the merits. In addition, upon a balancing of the equities under the "Comparative Hardship Test" the harm to the plaintiffs will be much greater to the plaintiffs if, the injunction is not granted, than the harm that the defendants will suffer if the injunction is granted. Therefore the balancing of the equities weighs in favor of the plaintiffs and against the defendants. Under this balancing test, the court will grant the injunction where the moving party presents proof that the comparative harm he will suffer if the injunction is not granted is significantly greater than the harm that the non moving party will suffer if the injunction is granted.

Here, upon information and belief, Shedrick Hamer has misappropriated valuable trade secrets and confidential proprietary information belonging to the plaintiffs. Although RCG brought in 11 Million dollars in revenue through one of the databases, the profit margins are incredibly low in this business. 11 million dollars is not the take home profit made by RCG simply because of the extremely high costs paid by RCG. This means that a few clients, temps, leads, contracts that are taken could severely cripple RCG and cause them to be at a loss rather than making a profit.

On February 6, 2019 Shedrick Hamer abruptly resigned from RCG but not before unlocking hundreds of leads in the ATC (**See exhibit "D"**) and TNS databases (**See exhibit "C"**) and exporting the data of almost 40,000 temps and almost 4,000 clients. (**See exhibits**

**"F and G").** Between January 28, 2019 and February 1 2019 upon information and belief, Shedrick Hamer cleaned out Remede Consulting Group's lead, client and temp databases to use for his own gain personally or at a competitor. This was done without plaintiff Jerome Daniel's knowledge or consent. RCG also has evidence that Hamer was working as a manager for a similar company that competes directly with Remede Consulting Group, called "Procare USA" simultaneously while he was working for RCG **(See exhibit "H").**

Defendant lived with Erin "Eli" Lewis during his employment with Remede. Remede as a Credentialing Specialist also employed Eli.  They both worked remotely for Remede from their home outside of Atlanta, GA. Erin Lewis also resigned abruptly on the same day as Shedrick Hamer, February 6, 2019. **(See exhibit "E").**

Upon further investigation by the plaintiffs, Shedrick Hamer has already used the information available in the stolen databases to "poach" a temp by the name of Shirley Gooden to work for him (defendant) at ProCare. **(See exhibit "H").** Shirley Gooden listed Shedrick Hamer as her "Recruiter from ProCare" on a "consent to release information" form. **(See exhibit "H").** The damage being done to RCG is immediate and irreparable and severely outweighs the damage that could potentially be done to the defendant if enjoined and restrained by TRO.

Upon information and belief, and in further violation of the non-solicitation clause of the signed employment contract; in violation of fiduciary duties; and in violation of common law fair competition laws; Shedrick Hamer has used his knowledge of trade secrets and confidential corporate information to solicit the business of existing medical staffing clients and/or to recruit RCG's active employees, inactive employees or to use for himself and/or his new employer. Here, in balancing the relevant factors, the court can see

that the plaintiff's injuries are immediate, irreparable injuries which cannot be repaired, restored or adequately compensated in money, and which compensation cannot be safely measured as in this case because damage to a corporation's reputation is irreparable because the injury is incalculable, thus, money damages are insufficient compensation. Here, plaintiff has no adequate remedy at law, and the plaintiffs will most likely prevail on the merits upon a Balancing of the Equities under the Comparative Hardship Test.

Furthermore, the Defendant was served properly and according to the CPLR and the affidavits of service were filed promptly and correctly. (See **the attached affidavit of service herein as "EXHIBIT 1"**).


**POINT II.**

**THE COMPLAINT ALLEGES VALID CAUSES OF ACTION AS A MATTER OF LAW**

As an initial matter, it is clear that, based upon the documents that the Moving Defendants have submitted to the Court, they have utterly failed to meet their burden as the moving party. The Moving Defendants moved to dismiss under FRCP 12(b)(6). In support of their motion, the Defendant submits three affidavits that are almost a year-old. The affidavits seemingly appear on their face to indicate that they are only in opposition to the Plaintiff's motion for injunction, however, in the named Defendant's affidavit, an entire section is carved out for him to specifically address the allegations in the complaint and is therefore clearly being included as support for the cross motion to dismiss. Furthermore, Defendant even directly and expressly cites to Hamer's affidavit in the Cross-Motion to dismiss on the last paragraph on page 17, under subsection "B." This is clearly an attempt by the Defendant to attach and include the declaration's of Shedrick Hamer, Erin Lewis, Jeri

20

Winley, and Shirley Gooden, as support for the 12(b)(6) Cross-Motion to Dismiss. However, the Declarations are extrinsic documentary evidence that are outside of the pleasdings and should not be considered by the court here in determining whether the causes of action in are sufficient as a matter of law. Furthermore, it should be noted that affidavits are not typically to be considered on a motion to dismiss under CPLR 3211(a)(1) which is the New York state equivalent to a FRCP 12(b)(6) motion to dismiss.

On a motion to dismiss, the allegations in the complaint are accepted as true. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir. 1998). In deciding a motion to dismiss, all reasonable inferences are drawn in the plaintiff's favor. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir. 1995). A defendant's motion to dismiss should be granted if it appears that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 514, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002).

However, "even a pro se complaint will be dismissed if it does not contain 'sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Mimms v. Carr*, No. 09-CV-5740 (NGG) (LB), 2011 U.S. Dist. LEXIS 61853, at *7 (E.D.N.Y. June 7, 2011) (quoting *Ashcroft v. Iqbal.* 556 U.S. 662, 129 S. Ct 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007))).

The materials a court may consider when deciding a motion to dismiss under FRCP 12(b)(6) are limited. "[A] district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Additionally, the court can consider documents provided by the defendant that "a plaintiff

chooses not to attach to the complaint or incorporate by reference," but which the plaintiff "has relied upon ... in framing the complaint." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991). "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce [the document] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

"A court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Accurate Grading Quality Assurance, Inc. v. Thorpe*, 2013 U.S. Dist. LEXIS 42760, at *23 (S.D.N.Y. Mar. 26, 2013). *See also In re Livent, Inc. Noteholders Securities Litigation*, 151 F. Supp. 2d 371, 405-406 (S.D.N.Y. 2001).

A Rule 12(b)(6) motion in any civil case is analyzed under the standard announced in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Iqbal, 556 U.S. at 678-79. To survive a Rule 12(b)(6) motion, the plaintiff must state a claim that is "plausible on its face." A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556); Gonzales v. Kay, 577 F.3d 600, 603 (5th Cir. 2009); Fields v. Dep't of Pub. Safety, 911 F. Supp. 2d 373, 383 (M.D. La. 2012) (Jackson, J.). The complaint must contain "allegations plausibly suggesting (not merely consistent with)" an entitlement to relief.Twombly, 550 U.S. at 557. Thecomplaint "must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting

Twombly, 550 U.S. at 570). The facts in the Complaint must "raise a right to relief above the

speculative level," and into the "realm of plausible liability." SeeTwombly, 550 U.S. at 555. In

other words, the complaint must allege enough facts to move past possibility and on to

plausibility of "entitlement to relief." Id. at 558.

> Determining whether a complaint states a plausible claim for relief [is]...a
> context-specific task that requires the reviewing court to draw on its judicial
> experience and common sense. But where the well-pleaded facts do not permit the
> court to infer more than the mere possibility of misconduct, the complaint has
> alleged—but it has not "show[n] "—"that the pleader is entitled to relief.

Iqbal, 556 U.S. at 679 (quoting FED.R.CIV.P.8(a)(2)) (internal citation omitted); see
alsoGonzales, 577 F.3d at 603 (same).

The plaintiff must plead factual content that allows the court to draw reasonable

inferences that the defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678; see also

Gonzalez, 557 F.3d at 603. A complaint attacked by a Rule 12(b)(6) motion to not need,

however, set forth detailed factual allegations (unless otherwise required such as in instances of

fraud under FED.R.CIV.P. 9 or the Private Securities Litigation Reform Act (PSLRA)).

Compare Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) (complaint need not contain

specific factual allegations to state a prima facie case of discrimination and Rule 9(b) does not

explicitly require greater pleading requirements set forth in Rule 8(a) for discrimination cases ),

withTellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) (discussing heightened

pleading requirements required by PSLRA to survive Rule 12(b)(6) motion).

**A.**

The Second Cause of Action in the Complaint, alleged against Hammer, is for breach of

the duty of loyalty. Hammer argues in support of the instant motion to dismiss that Plaintiff

failed to identify the basis for a claimed duty of loyalty. Again, this argument fails.

The Complaint alleges that Hammer owed to Plaintiff a duty of loyalty by virtue of his employment. The duty of loyalty owed by an employee to an employer is well-established. "Fundamental to [the employer-employee] relationship is the proposition that an employee is to be loyal to his employer and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" Western Elec. Co. v. Brenner, 41 N.Y.2d 291 (1977). Indeed, "it is likewise basic that absent an agreement otherwise, an employee who makes a profit or receives a benefit in connection with transactions conducted by him on behalf of his employer is under a duty to give such profit or benefit to his employer, whether or not it was received by the employee in violation of his duty of loyalty." Id. at 295. Clearly, there is no merit to Hammer's argument that no such duty exists or that the plaintiffs fail to indicate any fiduciary duty owed by defendant.

Of course, counsel's denial that Hammer did not breach any duty of loyalty to the Plaintiff nor did he owe one for that matter because the "relationship is arms' length, not fiduciary in nature, is unavailing. The rule that employees, including at-will employees, owe fiduciary duties to their employers arose out of the law of agency. Simply put, all employees are "agents" of their employers. And as agents, employees have a fiduciary duty to act loyally for the principle's (the employer's) benefit in all matters connected with the agency relationship. Restatement (Third) of Agency §8.01. As *comment c* to that section states:

> All who assent to act on behalf of another person and subject to that person's control are common-law agents as defined in §1.01 and are subject to the general fiduciary principle stated in this section. Thus, the fiduciary principle is applicable to gratuitous agents as well as to agents who expect compensation for their services, and to employees as well as to nonemployee professionals, intermediaries, and others who act as agents.

24

Furthermore, as the Restatement explained in §8.01, the duty *centers* on the duty of loyalty. In fact, Restatement (Third) §1.01 *comment g* explains "as agents, all employees owe duties of loyalty to their employers."

In the employment context, aspects of the duty of loyalty include the duty that the employee will not compete with their employer, solicit the employer's customers, clients or employees prior to the leaving the company, or use work time to further the employee's own interests. It also includes the duty not to misappropriate confidential information or trade secrets of the employer by sharing that information with the new employers.

Similarly unavailing is the argument that the Plaintiff did not identify a duty owed or breached by the Defendant when in fact the very title and heading describing what the second cause of action alleges is in bold letters and states "**BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH.**" The facts alleged in the second cause of action meet the elements required for a cause of action for breach of fiduciary duty of loyalty.

In New York, "In order to establish a breach of fiduciary duties, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." *Kurtzman v. Bergstol*, 40 A.D.3d 588, 590, 835 N.Y.S.2d 644 (2nd Dep't 2007); *see also Pokoik v. Pokoik*, 982 N.Y.S.2d 67, 70, 115 A.D.3d 428 (1st Dep't 2014)."A fiduciary relationship exists between an agent and principal, signifying a relationship of trust and confidence whereby the agent is bound to exercise the utmost good faith and undivided loyalty toward the principal throughout the relationship." 2 Leon C. Lazer, et al., *New York Pattern Jury Instructions – Civil* § 3.59 (2d ed. 2006); *see also Sokoloff v. Harriman Estates Development Corp.*, 96 N.Y.2d 409, 416, 754 N.E.2d 184, 729 N.Y.S.2d 425 (N.Y. 2001); *Lamdin v. Broadway Surface Advertising Corp.*, 272 N.Y. 133, 138, 5 N.E.2d 66,

67 (N.Y. 1936); *In re Estate of Naumoff*, 301 A.D.2d 802, 803, 754 N.Y.S.2d 70 (3d Dep't 2003).

     Additionally within the alleged facts is also clearly stated that the duty of good faith was breached as well. *(See generally* Doc. No.: 1-1¶¶ 50-62). Accordingly, the Complaint properly alleges breach of the duty of loyalty and Hammer's motion to dismiss seeking dismissal of this cause of action should be denied.

**B.**

     The Third Cause of Action in the Complaint, alleged against the defendant is Conversion and it is adequately alleged in the complaint. *(See generally* Doc. No.:1¶¶ 63-69). The key elements of conversion are "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." <u>Colavito v. New York Organ Donor Network, Inc.</u>, 8 N.Y.3d 43 (2006) (citations omitted) Plaintiff has a possessory right over its own files, customer lists, business information and data, and confidential proprietary information. The Complaint alleges that the defendant exercised unauthorized dominion over this confidential information in derogation of Plaintiff's rights. . Plaintiff has been damaged. <u>See</u> Compl. (Exhibit "A" to moving papers),

     Defendant's argument that such conduct was not "unauthorized" and is supported by the employment contract is baseless. It defies logic that Plaintiff would authorize the taking of valuable proprietary data and information and contract for its retention even after someone's resignation.

     The Complaint specifically alleges that the conduct was not authorized. Indeed, it is nonsensical to suggest that a business owner would authorize an employee to retain proprietary

information and trade secrets from the business. Although irrelevant for the purposes of a motion to dismiss, Hammer does not even set forth in his affidavit that he was expressly authorized to download and take such proprietary trade secrets as needed or to take possession of Plaintiff's confidential information. Rather, the Complaint states just the opposite. Notwithstanding, it is obvious that discovery is necessary, and dismissal is not warranted. The Moving Defendants' mere denial that the alleged conduct took place or claim that it was done with permission is not a basis for dismissal.

Finally, the Moving Defendants' argument that the cause of action for conversion is redundant of Plaintiff's cause of action for breach of contract is similarly unavailing. The taking of the physical database to the exclusion of the Plaintiffs constitutes conversion of the property not just a breach of contract. It is well- established that a party may plead alternative and inconsistent causes of action. CPLR 3014 provides: "[c]auses of action or defenses may be stated alternatively or hypothetically." See also 159 MP Corp. v. Redbridge Bedford, LLC, 160 A.D.3d 176 (2d Dep't 2018) ("CPLR 3014 clearly permits the pleading of alternative and inconsistent causes of action"); Thaw v. North Shore University Hosp., 129 A.D.3d 937 (2d Dep't 2015) ("nothing prevents the plaintiff from pleading, in the alternative"); Winick Realty Group LLC v. Austin & Associates, 51 A.D.3d 408 (1st Dep't 2008) ("Finally, since plaintiff is entitled to plead inconsistent causes of action in the alternative the quasi-contractual claims are not precluded by the pleading of a cause of action for breach of [contract]."). Accordingly, dismissal at this stage on this basis would be premature and inappropriate. Notwithstanding, to the extent that the Moving Defendants deny the existence of any breach of contract then the argument that other claims are duplicative is disingenuous and should be rejected.

Additionally, the defendant's use and access of both ATC and TNS subscription services upon his resignation thereby gaining access to a few hundred more leads, temps, and clients, effectively locked out RCG employees from accessing any leads, temps, or clients through those two services until the following month.

**C.**

The Complaint Adequately States a Cause of Action for Unjust Enrichment and can be plead in the alternative. The Fourth Cause of Action in the Complaint, alleged against all of the defendants, is for unjust enrichment. As stated above, it is well- established that a party may plead alternative and inconsistent causes of action. CPLR 3014 provides: "[c]auses of action or defenses may be stated alternatively or hypothetically." See also 159 MP Corp. v. Redbridge Bedford, LLC, 160 A.D.3d 176 (2d Dep't 2018) ("CPLR 3014 clearly permits the pleading of alternative and inconsistent causes of action"); Thaw v. North Shore University Hosp., 129 A.D.3d 937 (2d Dep't 2015) ("nothing prevents the plaintiff from pleading, in the alternative"); Winick Realty Group LLC v. Austin & Associates, 51 A.D.3d 408 (1st Dep't 2008) ("Finally, since plaintiff is entitled to plead inconsistent causes of action in the alternative the quasi-contractual claims are not precluded by the pleading of a cause of action for breach of [contract].").

Accordingly, dismissal at this stage on this basis would be premature and inappropriate. Notwithstanding, to the extent that the Moving Defendants deny the existence of any breach of contract then the argument that other claims are duplicative is disingenuous and should be rejected.

**D.**

The fifth cause of action for Misappropriation of Trade Secrets is properly plead

and should not be dismissed for failure to state a cause of action. The Moving Defendants argue that this cause of action fails because leads, customer database and customer details are not entitled to trade secret protection. This argument fails. A cause of action for theft or misappropriation of trade secrets is established by showing that the plaintiff possesses a trade secret and that the defendants used the trade secret in breach of an agreement, confidence of duty, or as a result of discovery by improper means. Marsh USA, Inc. Alliant Ins. Services, Inc., 49 Misc.3d 1210(A) (Sup. Ct. N.Y. Co. 2015). Similarly, misappropriation of confidential information is established by showing "that plaintiff took steps to protect the secrecy of the information allegedly being misappropriated." Id. In this case, the confidential information contained, among other things, a customer list, biographical and demographic information, field notes, qualifications, and private confidential data that Plaintiff has compiled through significant effort and expense and of which Plaintiff took steps to protect the secrecy.

As set forth in the Complaint, Defendant took and used the foregoing documents and information, which qualify as trade secrets by improper means. "New York generally looks to section 757 of the first Restatement of Torts for its definition of a trade secret. Under this definition, a trade secret is 'any formula, pattern, device *or compilation of information which is used in one's business*, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" Softel, Inc. v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955 (2d Cir. 1997) (citations omitted) (emphasis added).

In addition, customer lists obtain the status of a trade secret where significant effort was required to compile and generate such information. See Town & Country House &

Home Service, Inc. v. Newbery, 3 N.Y.2d 554 (1958) (employer expended time and money, over years of effort and advertising, to build up customer list); Hecht Foods, Inc. v. Sherman, 43 A.D.2d 850 (2d Dep't 1974) ("the list of customers becomes a valuable asset of the business, since it has been established through dint of considerable effort and expense over a period of time. These attributes of the list in this case made clear to us that it is the kind of list protected as a trade secret"); see also Alpha Funding Group, Inc. v. Aspen Funding, LLC, 17 Misc.3d 1126(A) (Sup. Ct. Kings Co. 2007).

As previously stated, the Defendant is confusing the ATC and TNS subscription services which are paid private subscription accounts that grant RCG access to some leads, temps, and client data is not the full database that was exported and downloaded just prior to the Defendant's resignation. The CTM database is what the Defendant effectively took and is the database that RCG has been compiling and building for years. The subscription services simply do not provide the degree and magnitude of data and information that RCG housed in it's CTM database. It was the result of years of work with certain individuals, temps, leads, clients, and facilities. It is not a public list that anyone has access to else I would certainly challenge the Defendant to produce the database that is at issue here. Usiing the Defendant's own example, Plaintiffs' attorney can easily reproduce the exact same cases or documents brought up by Defense counsel through Lexis or Westlaw subscription service. However, the database that RCG has built and compiled is unique and certainly not publically available and therefore could not be reproduced by the Defendant unless he already had a copy of it saved.

A cause of action for theft or misappropriation of trade secrets is established by showing that the plaintiff possesses a trade secret and that the defendants used the trade

secret in breach of an agreement, confidence of duty, or as a result of discovery by improper means. Marsh USA, Inc v. Alliant Ins. Services, Inc., 49 Misc.3d 1210(A) (Sup. Ct. N.Y. Co. 2015).   Similarly, misappropriation of confidential information is established by showing "that plaintiff took steps to protect the secrecy of the information allegedly being misappropriated." Id. In this case, the confidential information contained, among other things proprietary databases, leads, clients, temps, lists that are accumulated and created by RCG.

E.

    As stated above the cause of action for Misappropriation of Trade Secrets is properly plead and should not be dismissed and therefore Defendant's argument for why the Sixth Cause of action for Unfair competition should be dismissed is invalid. The Moving Defendants argue that this cause of action fails because leads, customer database and customer details are not entitled to trade secret protection. This argument fails. A cause of action for theft or misappropriation of trade secrets is established by showing that the plaintiff possesses a trade secret and that the defendants used the trade secret in breach of an agreement, confidence of duty, or as a result of discovery by improper means. Marsh USA, Inc. Alliant Ins. Services, Inc., 49 Misc.3d 1210(A) (Sup. Ct. N.Y. Co. 2015). Similarly, misappropriation of confidential information is established by showing "that plaintiff took steps to protect the secrecy of the information allegedly being misappropriated." Id. In this case, the confidential information contained, among other things, a customer list, biographical and demographical information, field notes, qualifications, and private confidential data  that Plaintiff has compiled through significant effort and expense and of which Plaintiff took steps to protect the secrecy.

As set forth in the Complaint, Defendant took and used the foregoing documents and information, which qualify as trade secrets by improper means. "New York generally looks to section 757 of the first Restatement of Torts for its definition of a trade secret. Under this definition, a trade secret is 'any formula, pattern, device *or compilation of information which is used in one's business*, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" Softel, Inc. v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955 (2d Cir. 1997) (citations omitted) (emphasis added).

In addition, customer lists obtain the status of a trade secret where significant effort was required to compile and generate such information. See Town & Country House & Home Service, Inc. v. Newbery, 3 N.Y.2d 554 (1958) (employer expended time and money, over years of effort and advertising, to build up customer list); Hecht Foods, Inc. v. Sherman, 43 A.D.2d 850 (2d Dep't 1974) ("the list of customers becomes a valuable asset of the business, since it has been established through dint of considerable effort and expense over a period of time. These attributes of the list in this case made clear to us that it is the kind of list protected as a trade secret"); see also Alpha Funding Group, Inc. v. Aspen Funding, LLC, 17 Misc.3d 1126(A) (Sup. Ct. Kings Co. 2007).

As previously stated, the Defendant is confusing the ATC and TNS subscription services which are paid private subscription accounts that grant RCG access to some leads, temps, and client data is not the full database that was exported and downloaded just prior to the Defendant's resignation. The CTM database is what the Defendant effectively took and is the database that RCG has been compiling and building for years. The subscription services simply do not provide the degree and magnitude of data and information that RCG

housed in it's CTM database. It was the result of years of work with certain individuals, temps, leads, clients, and facilities. It is not a public list that anyone has access to else I would certainly challenge the Defendant to produce the database that is at issue here. Usiing the Defendant's own example, Plaintiffs' attorney can easily reproduce the exact same cases or documents brought up by Defense counsel through Lexis or Westlaw subscription service. However, the database that RCG has built and compiled is unique and certainly not publically avail :ble and therefore could not be reproduced by the Defendant unless he already had a copy of it saved.

"Under Federal or State law, the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets." *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505, 506 (4th Dep't1998). "An unfair competition claim rises and falls with a claim of misappropriation of trade secrets. *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851, 2006 U.S. Dist. LEXIS 61872, 2006 WL 2524187, at *29 (E.D.N.Y. Aug. 30, 2006).

As set forth in Point II D the Databases are trade secrets and the unfair competition claim cannot necessarily fail and must continue. Furthermore, Plaintiffs' never once allege "potential" misappropriation or unfair use of the Databases. [Doc. No.: 1 ¶¶ 95-105] Therefore, the cause of action for unfair competition should not be dismissed and should continue on to discovery.

**F.**

The first cause of action for Breach of Contract is clearly and properly alleged in the complaint and Defendant's mere denial of said breach does not amount to a dismissal

as a matter of law. It is properly alleged with particularity and is certainly not contradicted by the technical semantics of the trade that the Defendant is attempting to portray as an inconsistency or contradiction. Jerome Daniel contacted CTM database administrators in an attempt to discover any and all unauthorized downloads from CTM, made by Hamer just before his resignation on February 6, 2019. CTM houses RCG's entire client, employee and prospect database since the company's inception.  To put a value to this database, it generated $11.1 million in revenue in 2018.

The database administrators sent a copy of the user log that tracks and details a users activities involving RCG's business. The copy of the user log includes the IP address and Username of the individual currently accessing the database as well as the action that the individual took at that moment **(See exhibits "F and G").** The data report shows that Hamer exported and took a total of 36,953 leads on January 28, 2019 as well as exported and took a total of 3,183 clients' files on the same date **(See exhibits "F and G")**; then he abruptly resigned from RCG.

The database administrator that reported on the user activites of the Defendant expressly acknowledges and informs Daniel via email that the Hamer "exported 36,953 leads" and also "exported 3,183 clients' files." The database administrator reported that "they have no way of knowing" whether Hamer downloaded the Databases is not a contradiction to the complaint. According to the administrator for the CTM database, discovering that Hamer exported the lead and client data means it was effectively removed by Hamer. However, what is meant to be understood by "they have no way of knowing" whether Hamer downloaded them is because once they are exported they are no longer on the database system and are now a separate server or computer that CTM cannot access. So

34

essentially the database administrators were saying that they have no way of knowing specifically where Hamer moved the database information onto after the export. As it was explained, it could have been a flash drive, a torrent download, a zip file, a separate laptop, his own laptop, etc. However, what is certain is that Hamer exported the data on the CTM database which is only something you do before you download the information onto another source.

Furthermore, the Defendant is wrongly disputing the merits of the alleged breach by arguing or denying facts alleged in the complaint. Plaintiffs' have attached a consent to release form that was signed by Shirley Gooden in which she herself listed Shedrick Hamer as her "recruiter" for competitor and new employer ProCare USA. Although the defendant attempts to merely categorize Shirley Gooden's use of Hamer's name as a "reference" the exact language and title used by Gooden is "Recruiter" which clearly and plausibly suggests that Hamer recruited Gooden.

As stated however, all of this is a smokescreen attempt to try and argue the merits of the claim prematurely. The fact of the matter is that the Plaintiff has properly alleged the the elements of a claim for breach of contract in the complaint. The elements are: (1) the existence of a contract, (2) due performance of the contract by plaintiff, (3) breach of the contract by defendant, and (4) damages resulting from the breach." *MBIA Ins. Corp. v. Royal Bank of Can.*, 28 Misc. 3d 1225(A), 1225A, 958 N.Y.S.2d 62, 62 (New York Sup. Ct. 2010).

**POINT III**.

Daniel has been injured and damaged as a result of this matter as well. All of the allegations include and are concerning him personally or professionally. The Agreement is a contract between Hamer and Remede, which was signed by Daniel. Additionally, There is privity

between Hamer and Daniel. Daniel is entitled to relief and should remain as a party to the action. *Onanuga v. Pfizer*, Inc., 2003 U.S. Dist. LEXIS 20298 (SDNY 2003). *Onanuga v. Pfizer*, Inc., 2003 U.S. Dist. LEXIS 20298 (S.D.N.Y. 2003); *Arroyo v. PHH Mortg. Corp.*, 2014 U.S. Dist. LEXIS 68534 (E.D.N.Y. 2014).

**POINT IV.**

Based on the foregoing the Defendant's motion should be denied and therefore is not entitled to attorneys fees as provided by the employment contract attached as **EXHIBIT B**.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that this Court deny Shedrick Hammer's Motion to Dismiss pursuant to FRCP 12b(6) in its entirety and grant Plaintiff's Motion for an Preliminary Injunction.

Plaintiff's Complaint was filed on May 26, 2019. No discovery has taken place in this matter. The Moving Defendants will not be prejudiced by an amendment to the Complaint alleging further details as to the causes of actions brought against the Moving Defendants, as no additional resources to conduct discovery and prepare for trial would be necessary and resolution of this dispute would not be significantly delayed. Thus, under the liberal standard set forth by CPLR 3025(b), if the present Complaint is found to be insufficient, Plaintiff should be permitted to file a First Amended Complaint.

Dated: Mineola, New York
      June 8, 2020

                                Meir Moza, Esq.,
                                217 Willis Avenue, Suite 101
                                Mineola, New York 11501
                                (516) 741-0003
                    LAW OFFICES OF MEIR MOZA & ASSOCIATES
          *Attorney for Plaintiffs Remede Consulting Group INC.; and Jerome Daniel*

36